UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE APPLICATIONS FOR ARREST WARRANTS AND ISSUANCE OF CRIMINAL COMPLAINTS | Case No. 3:21MJ___ (TFO) <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR ARREST WARRANTS AND ISSUANCE OF CRIMINAL COMPLAINTS**

I, Christopher Kiely, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a Task Force Officer with the Federal Bureau of Investigation ("FBI"), Northern Connecticut Gang Task Force, and have been since July 2020. I have approximately 11 years of police investigative experience with the New Britain Police Department, with approximately 7 years of that in the capacity of Detective. As a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 3061, I am empowered by federal law to conduct investigations and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code, and other federal offenses. I have conducted numerous investigations including narcotics, firearms, locating of wanted persons, violent crimes against persons, and property crimes, which have required the analysis of mobile phones to include cell tower records, call records, and communications to further an investigation.

2.     I make this affidavit in support of criminal complaints and arrest warrants for Eric WOODIE, Dominic COLON-BROWN, and Julien JUDGE for violations of 18 U.S.C. § 371 (conspiring to engage in the business of dealing in firearms without a license and to transport stolen firearms in interstate commerce contrary to § 922(a)(1)(A) and § 922(i)).

3.     The facts in this affidavit come from: my personal observations, my training and experience, my review of police reports, documents, surveillance video, and information

obtained from other agents and witnesses. This affidavit is intended to show merely that there is

probable cause for the requested complaints and arrest warrants and does not set forth all of my

knowledge about this matter.

## PROBABLE CAUSE

### SUMMARY

4.        As described in more detail below, WOODIE, COLON-BROWN, and JUDGE

conspired to engage in the business of dealing in firearms without a license and to transport

stolen firearms in interstate commerce. More specifically, in January 2021, WOODIE and

COLON-BROWN sold a firearm to INDIVIDUAL B. COLON-BROWN admitted to selling the

firearm in a recorded conversation with INDIVIDUAL B. In late February 2021, WOODIE

rented a car, which JUDGE and COLON-BROWN took to Florida to obtain stolen firearms and

used to bring the firearms back to Connecticut. WOODIE twice referred to the firearms from

Florida as an "arsenal" in a recorded conversation. In February and March 2021, WOODIE and

JUDGE had recorded conversations with another individual in which they said they intended to

sell him one of the firearms from Florida when he was released from custody. On March 8, 2021,

law enforcement recovered a firearm after a foot chase with WOODIE, and three additional

firearms were recovered in WOODIE's apartment, in which JUDGE and COLON-BROWN

were located. The serial number on one of those firearms matched the serial number of a firearm

that had been stolen in Florida the previous month. In May 2021, COLON-BROWN had

recorded conversations with INDIVIDUAL B in which COLON-BROWN discussed his firearm

sale to INDIVIDUAL B in January 2021, his trip to Florida to obtain firearms in February 2021,

and additional future trips to Florida and Massachusetts to buy more firearms to sell to

INDIVIDUAL B. During one such conversation, COLON-BROWN stated: "I can get em, I can

get em all day," referring to firearms. Later in May 2021, JUDGE traveled to Massachusetts and posted a video of himself with what appears to be a firearm and a large amount of cash. That same day, after JUDGE returned from Massachusetts, COLON-BROWN posted a video of himself with what appears to be a firearm on his chest.

## REPORT OF BULLET SHOT THROUGH FLOOR

5.      On or about December 19, 2020, officers with the New Britain Police Department responded to 259 Grove Street, Apartment 1S, based on a report from a resident who found a bullet hole in her kitchen ceiling and a projectile under her kitchen chair. Officers went to Apartment 2S, which is immediately above Apartment 1S, and made contact with a resident who let officers inside the apartment. Officers observed a small hole in the kitchen floor of Apartment 2S, which appeared consistent with a bullet having been fired from Apartment 2S down into Apartment 1S. A protective sweep of Apartment 2S located WOODIE and COLON-BROWN sleeping in the east bedroom. INDIVIDUAL C was located asleep in the west bedroom. No arrests were made at that time.

## SALE OF FIREARM 1

6.      On January 18, 2021, members of the FBI Northern Connecticut Gang Task Force (the "Task Force") utilized an FBI Confidential Human Source ("CHS-1")[1] to conduct a

---

[1] CHS-1 cooperated with the FBI for compensation and has been paid approximately $1,000 for his/her work on this and other investigations. While cooperating with FBI on a separate investigation, CHS-1 was initially untruthful with investigators about aspects of his proactive cooperation. CHS-1 later admitted that he was not fully truthful and understands s/he may face criminal charges for that conduct. CHS-1's continued cooperation after that conduct has been in the hopes of receiving a lesser sentence on potential charges.

controlled purchase of a firearm from INDIVIDUAL B. Based on the information below,

INDIVIDUAL B received the firearm from WOODIE and COLON-BROWN.

7.     On January 13, 2021, and January 16, 2021, CHS-1 communicated via text message

with INDIVIDUAL B to arrange for the purchase of a firearm. As part of that communication,

INDIVIDUAL B sent the following photograph and message to CHS-1:



22 but they want too much for that and I was told it was new now he comes at me with this. New 9's are way too much not worth it but this is clean

8.     When CHS-1 asked the price of the firearm, INDIVIDUAL B told him/her that

INDIVIDUAL B's supplier wanted too much money for it and that s/he would try to negotiate

with the supplier for a lower price. CHS-1 ultimately agreed to pay $1,200 for the firearm.

9.     On or about January 18, 2021, according to CHS-1, INDIVIDUAL B instructed

CHS-1 to meet him/her at an address in New Britain, CT. Prior to the purchase of the firearm,

CHS-1 met with a law enforcement agent, who searched CHS-1 and his/her vehicle for contraband

and weapons with negative results. Law enforcement also equipped CHS-1 with audio and video

recording equipment and provided him/her with $1,200 in FBI evidence funds.[2] Law enforcement maintained surveillance of CHS-1 as he/she was en route to the meet location, ensuring that CHS-1 made no stops along the way.

10.     Members of the FBI Task Force established surveillance of the meet location. They observed CHS-1 meet with INDIVIDUAL B.[3] According to CHS-1 and the video of the transaction, at this point CHS-1 gave INDIVIDUAL B the $1,200 in FBI evidence funds. INDIVIDUAL B then told CHS-1 to leave the area and wait for a phone call because s/he had to have the firearm delivered. CHS-1 then left the area and followed Task Force Officer Pillai to the prearranged meet location to wait for INDIVIDUAL B's phone call.

11.     Approximately 90 minutes after INDIVIDUAL B met with CHS-1, law enforcement observed a green Honda bearing Connecticut Historical Registration 00-NYSD arrive at the location in New Britain identified by INDIVIDUAL B. A younger black male exited the driver's seat of the Honda, and members of the FBI Task Force observed the male to be holding an unknown object in his jacket pocket as he walked into the residence. The male exited

---

[2] Approximately $300 of these funds had been previously provided to CHS-1 by INDIVIDUAL A, who had hired CHS-1, not knowing that he/she was working with law enforcement, to purchase a firearm to use in an unrelated crime. INDIVIDUAL A has been charged in state court. When CHS-1 received the $300 from INDIVIDUAL A, he/she gave the money to the FBI, who then used it to purchase the firearm from INDIVIDUAL B.

[3] The identification of INDIVIDUAL B is based on the following: (a) CHS-1 provided INDIVIDUAL B's full name based on his/her prior relationship and interactions with INDIVIDUAL B; and (b) based on the name provided by CHS-1, law enforcement obtained a known photograph of INDIVIDUAL B and compared the photograph with the person they saw meet with CHS-1. In addition, as explained below, INDIVIDUAL B was arrested in April 2021 and admitted that s/he sold a firearm to CHS-1 on January 18, 2021. Since his/her arrest, INDIVIDUAL B has been cooperating with law enforcement in the hopes of receiving a lesser sentence on his/her pending firearm charge.

the residence a short period of time later, not holding any objects in his jacket pocket, entered the driver's seat of the Honda, and left the area.

12.     I conducted a Connecticut Department of Motor Vehicle inquiry on the Honda and found it was registered to WOODIE.

13.     Members of the FBI Task Force followed the Honda and obtained a digital image of the driver when he exited the vehicle to pump gas. That image was sent to me, and I positively identified the person in the image as WOODIE, who I know through numerous police contacts and investigations via my experience as a Detective with the New Britain Police Department. Members of the FBI Task Force followed WOODIE in the Honda back to his residence of 259 Grove Street in New Britain. As noted above, officers encountered WOODIE at this location in December 2020 when investigating the bullet hole in the floor of Apartment 2S.

14.     During the surveillance of the Honda, there appeared to be another person in the car with WOODIE, but law enforcement could not make an identification of that person. Based on the information described below, including COLON-BROWN's own statements, I believe the second person in the Honda was COLON-BROWN.

15.     After WOODIE and COLON-BROWN left in the Honda, INDIVIDUAL B contacted CHS-1 and said that s/he had the "thing" and was on his/her way with it. Members of the FBI Task Force then followed INDIVIDUAL B in his/her vehicle to another location in New Britain, where they observed INDIVIDUAL B meet with CHS-1.

16.     According to CHS-1 and the audio/video recording of the meeting, INDIVIDUAL B sold CHS-1 a firearm during this meeting. According to the video, when INDIVIDUAL B entered CHS-1's vehicle, s/he told CHS-1: "The clip is in it and everything. It's ready for shooting." At this point in the video, a portion of the firearm is captured:



17.     According to the video, after handing the firearm to CHS-1, INDIVIDUAL B said, "You know what that is? A second generation Glock, uh what's it called, P, P, P22, second generation." INDIVIDUAL B went on to say, "You could look it up. It's, it's top of the line. And you're lucky. It's fifteen hundred dollars. I just told him [the firearms supplier], I said c'mon bro, please man. I've been doing this, and he said, 'from now on [name redacted], nine millimeters are that much.' They're taxing it."

18.     INDIVIDUAL B explained further that his/her supplier had more firearms to sell: "I got two more Glocks, he says. But they're more money now, so." After talking about possibly buying the additional firearms at a later date, INDIVIDUAL B left CHS-1's vehicle.

19.     Members of the FBI Task Force then followed CHS-1 to a predetermined location, maintaining constant surveillance on him/her to ensure that CHS-1 made no stops along the way. At the predetermined location, TFO Pillai met with CHS-1, who gave him a Smith & Wesson .22 Caliber (P22) firearm, with serial number L206122 ("Firearm 1"), which was later determined to be stolen. TFO Pillai searched CHS-1 and his/her vehicle with negative results and retrieved the audio/video recording device.

20.     On April 27, 2021, INDIVIDUAL B was charged with being a felon in possession of a firearm. In a *Mirandized* post-arrest statement, INDIVIDUAL B stated that COLON-

BROWN supplied Firearm 1 that INDIVIDUAL B sold to CHS-1. According to INDIVIDUAL B, s/he kept $300 of the money provided by CHS-1 for the firearm, and s/he gave the other $900 to COLON-BROWN

21.     The telephone toll records between INDIVIDUAL B and phone number 203-893-XXXX, used by COLON-BROWN (Target Phone 3),[4] show that INDIVIDUAL B and COLON-BROWN had numerous contacts on January 17 and January 18, 2021. In particular, one of those contacts occurred on January 18, 2021, at approximately 3:47 p.m., which was approximately 10 minutes before the green Honda, registered to WOODIE, arrived to meet INDIVIDUAL B, as described in Paragraph 10 above. That phone call was also shortly before INDIVIDUAL B told CHS-1 that s/he now had the "thing" and was on the way with it.

<u>TRIP TO FLORIDA TO OBTAIN MORE FIREARMS</u>

22.     On February 26, 2021, CHS-2[5] contacted an officer with the New Britain Police Department stating that s/he had important information to share. The next day, February 27, 2021, the officer spoke with CHS-2, who stated that JUDGE, COLON-BROWN, and "[redacted name]"[6] had rented a Grey Nissan Sentra with a New York license plate and drove to Florida where they acquired numerous Glock handguns with extended magazines.

---

[4] TARGET PHONE 3 is registered to "Dominic Brown," which closely resembles the name DOMINIC COLON-BROWN. INDIVIDUAL B also identified TARGET PHONE 3 as COLON-BROWN's phone number, which was listed as "DOM BMW" in INDIVIDUAL B's phone, which was searched after his/her arrest.

[5] CHS-2 is cooperating with law enforcement in the hopes of receiving a lesser sentence on pending charges, as well as the possibility of compensation.

[6] The redacted name is a shortened version of the first name of INDIVDUAL C.

23.     According to records provided by Enterprise Holdings, WOODIE rented a Nissan

Sentra with New York registration JFP5997 on February 25, 2021, and he returned it two days

later on February 27, 2021. When renting the vehicle, WOODIE provided 310-497-XXXX

(TARGET PHONE 1), subscribed to WOODIE, as his primary phone number, and he provided

860-518-XXXX (TARGET PHONE 2) as his "other phone." TARGET PHONE 2 is subscribed

to JUDGE, though WOODIE did not list JUDGE, or anyone else, as an authorized driver on the

rental paperwork.

24.     On March 15, 2021, Enterprise Holdings provided me with surveillance footage

from its car rental facility located in East Hartford. According to that footage, on February 25,

2021, WOODIE arrived at the facility in a silver Honda bearing Connecticut Registration

AT63418, which is a vehicle registered to JUDGE. WOODIE exited the vehicle and went inside

the facility to engage in a rental agreement with Enterprise at approximately 8:16 AM. A short

time later, WOODIE was escorted outside by an Enterprise employee, who brought him to a gray

Nissan Sentra bearing New York Registration JFP5997. According to the video footage, the

rented Nissan Sentra and the Honda registered to JUDGE left the parking lot together.

25.     According to law enforcement databases with data from automated license plate

readers, the rented Nissan traveled to Florida and back between February 25-27, 2021.

26.     On February 27, 2021, at approximately 8:10 AM, the Enterprise surveillance

footage shows JUDGE's Honda parked in the parking lot of the same Enterprise facility. The

surveillance footage later captures WOODIE and an unknown male exiting JUDGE's Honda

when the rented Nissan pulled into the parking lot. Three people exited the rented Nissan who

appear to have similar likenesses and characteristics to JUDGE, COLON-BROWN, and

INDIVIDUAL C. The male suspected to be COLON-BROWN removed a backpack and duffle

bag from the trunk of the rented Nissan and placed them in the trunk of JUDGE's Honda. The person suspected to be JUDGE threw what appears to be a car key to WOODIE as WOODIE walked to the Enterprise office. After closing out his rental, WOODIE exited the Enterprise office, and all five males left together in the JUDGE's Honda.

27.    According to the rental records, the mileage on the Nissan Sentra when WOODIE returned the vehicle indicated that it had been driven 2,613 miles in two days.

28.    Law enforcement obtained toll records for TARGET PHONE 1, which is the number WOODIE provided to Enterprise as his primary number. According to those records, between February 25-27, 2021, TARGET PHONE 1 had approximately 20 contacts with TARGET PHONE 2 (JUDGE's phone) and approximately 16 contacts with TARGET PHONE 3 (COLON-BROWN's phone) during the Florida trip when WOODIE is believed to have been in Connecticut[7] and when JUDGE, COLON-BROWN, and INDIVIDUAL C traveled to and from Florida.]

## STOLEN FIREARMS IN FLORIDA

29.    According to police reports in Pasco County, Florida, on or about February 20, 2021, numerous vehicles were burglarized and multiple firearms were stolen from inside the vehicles. So far in the investigation, one of the stolen firearms has been identified as a Glock 9mm handgun with a serial number of WHA242 ("Firearm 2"). The serial numbers for the other stolen firearms are currently unknown.  As described in more detail below, Firearm 2 was recovered on March 8, 2021, at 259 Grove Street in New Britain, Connecticut, where both

---

[7] WOODIE likely did not go on this trip because he had unrelated state charges pending and was on pretrial release with a $500,000 bond. As described below, in a recorded phone call on February 26, 2021, WOODIE stated that he had "just sent these niggas to Florida."

WOODIE and JUDGE resided. JUDGE and COLON-BROWN were inside the apartment when Firearm 2 was recovered.

30.     According to Detective George Sosa of the Pasco County, Florida Sheriff's Department, who is working with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on the investigation of the stolen firearms, it appears that various "Blood" gang members have been recruiting minors to break into vehicles in search of firearms to trade for quantities of marijuana provided by the "Blood" gang leaders. Those gang leaders then arrange for the firearms to be transported to the Northeast by members of the street gang from the Northeast.

31.     From my monitoring of WOODIE's social media and from conducting investigations into the "Blood" gang members in New Britain, I have observed WOODIE displaying colors and hand gestures indicating that he is affiliated with the "Mac Baller Brims" set of the "Blood" street gang. I also observed the same colors and hand gestures displayed on JUDGE's social media pages. In addition, WOODIE, COLON-BROWN, JUDGE, and INDIVIDUAL C all attended the funeral of a "Blood" gang member after a homicide in New Britain that occurred in October 2020.

<u>RECOVERY OF FIREARMS 2 THROUGH 5</u>

32.     On or about March 1, 2021, a state arrest warrant was issued for WOODIE for a violation of C.G.S. 54a-280a, in that WOODIE had failed to register his address in the Connecticut Deadly Weapon Offender Registry. WOODIE has multiple prior felony convictions, including weapons in a motor vehicle and possession of a controlled substance with intent to sell.

33.     On or about March 8, 2021, officers conducted surveillance of 259 Grove Street in New Britain, to locate and arrest WOODIE pursuant to the arrest warrant. As noted above,

WOODIE had been sleeping in Apartment 2S when officers conducted a protective sweep of that apartment on December 19, 2020. In addition, parole records showed that WOODIE's residence was 259 Grove Street, Apartment 2S, in New Britain, CT.

34.     At approximately 3:30 PM, officers observed WOODIE and JUDGE exit the rear door of 259 Grove Street. Officers exited their vehicle and announced "police." Both WOODIE and JUDGE then began running, and a foot chase occurred. JUDGE grabbed his waistband and ran back inside 259 Grove Street, slamming the door behind him.

35.     WOODIE ran west towards Grove Street. He ignored multiple orders to stop running. He ran north on Grove Street and then west on Carmody Street. An officer followed. When WOODIE approached Davis Street, an officer observed WOODIE to either be tucking or retrieving an item with his hands in front of him by his waistband. An officer saw WOODIE turn southbound on Davis Street where the officer briefly lost visual sight of him. During this brief period, an officer heard the sounds of bushes being disturbed. The officer then got sight of WOODIE on Davis Street and placed him under arrest.

36.     Officers searched the bushes near the intersection of Carmody and Davis where WOODIE had just ran and found a loaded Glock 22 .40 caliber handgun, with serial number PSZ519, and a high capacity magazine ("Firearm 3").

37.     WOODIE was placed under arrest. A search of his person resulted in a clear baggie containing five smaller clear knotted baggies containing a white powdery substance that field-tested positive for cocaine. WOODIE also had $1,038 in cash on him.

38.     Immediately after apprehending WOODIE, officers returned to 259 Grove Street where JUDGE had fled, holding his waistband. Officers went to Apartment 2S and forcibly entered the apartment while announcing their presence and asking any occupants to come out

with their hands up. Two individuals, JUDGE and COLON-BROWN appeared and were

handcuffed by officers. COLON-BROWN had an active warrant for his arrest on unrelated

charges.

39.     Officers conducted a protective sweep of Apartment 2S to look for other

individuals and found none. During the protective sweep, officers saw what appeared to be

narcotics and narcotics paraphernalia. Officers then secured the apartment while they obtained a

search warrant.

40.     Two state search warrants were obtained for 259 Grove Street, Apartment 2S, the

first search warrant being for narcotics and narcotics paraphernalia, and the second being for

firearms. While first searching for narcotics, law enforcement located firearms, ammunition, and

firearm magazines. They thereafter sought and obtained the second search and seizure warrant

for the firearms.

41.     During the searches, law enforcement recovered three firearms, two extended

magazines, 104 rounds of ammunition, approximately 60 grams of a white powdery substance

that field-tested positive for cocaine, and various narcotics paraphernalia, among other things.

More specifically, in the center bedroom of the apartment, on top of the bed under the end of a

blanket, officers found a black Glock 27 .40 caliber handgun with serial number GYD626

("Firearm 4"). This firearm had a laser sight attached to it. In the closet of this same bedroom,

officers found a 22 round extended magazine, loaded with 16 rounds.

42.     In the kitchen of Apartment 2S, officers found two firearms submerged in a bag

of protein powder supplement located on top of the refrigerator. One of the firearms was Firearm

2, which had been stolen from a vehicle in Florida as described above. When it was recovered in

the bag on top of the refrigerator, Firearm 2 had a light attachment and was loaded with a 14-

round extended magazine containing 14 bullets. The other firearm in the bag was a loaded Glock 43 9mm with serial number ZXC839, with a 6 round magazine ("Firearm 5").

SEARCH OF WOODIE'S PHONE

43.     When WOODIE was arrested,[8] a blue iPhone 12 (the TARGET DEVICE) was located on his person. I interviewed WOODIE the morning after his arrest. I advised him of his *Miranda* rights, which he waived in writing and agreed to speak with me. In that interview, which was video recorded, WOODIE stated the cell phone number for the TARGET DEVICE was 310-497-XXXX (the same phone number as TARGET PHONE 1, which had numerous contacts during the Florida trip when WOODIE was in Connecticut and when JUDGE, COLON-BROWN, and INDIVIDUAL C traveled to Florida and back).

44.     On March 18, 2021, the Honorable Thomas O. Farrish, United States Magistrate Judge for the District of Connecticut, signed a search warrant for the TARGET DEVICE.

45.     From the forensic extraction of the data on the TARGET DEVICE, I was able to view the following files:

    a.     A photograph dated February 28, 2021, depicting WOODIE, INDIVIDUAL C, and an unidentified male with what appear to be black handguns affixed with laser lights/flashlights. The date of this photograph is one day after JUDGE, COLON-BROWN, and INDIVIDUAL C returned from Florida in WOODIE's rental car.

    b.     A video of the same three people showing off the suspected handguns for the camera.

---

[8] WOODIE is currently charged in state court with various firearms and narcotics charges for this conduct.

c.      A video dated March 2, 2021, depicting a dark-skinned male with the lower receiver of a Glock style firearm, commenting on how dirty the firearm is. I recognize the voice in this video to be WOODIE's voice.

d.      A photograph dated March 5, 2021, depicting what appears to be a handgun with a laser sight on it held by a dark-skinned male.

e.      A photograph dated March 5, 2021, depicting what appears to be a Glock style handgun with an extended magazine inserted.

f.      A photograph with an unknown date depicting what appears to be two Glock style handguns on the lap of a dark-skinned male with a ring on his left pinky finger.

g.      A photograph with an unknown date of what appears to be a Glock handgun magazine with what appears to be ammunition in the hand of a dark-skinned male.

46.     All of the Glock style components in these photographs and videos are consistent with the firearms and magazines recovered from 259 Grove Street, Apartment 2S in New Britain on March 8, 2021.

## RECORDED CONVERSATIONS WITH WOODIE AND JUDGE

47.     In February and March 2021, an inmate at Hartford Correctional Center ("Inmate 1") made several outgoing phone calls to TARGET PHONE 1 and had conversations with WOODIE and JUDGE.[9] These phone calls were recorded by the jail, and the recordings were

---

[9] WOODIE's voice is identified on the calls by the following evidence: (1) Inmate 1 called TARGET PHONE 1, which is subscribed to WOODIE, and WOODIE himself identified that number as his during his statement after his arrest on March 8, 2021; (2) I recognize the voice as WOODIE's based on my prior interactions with him, including my interview of him after his arrest on March 8, 2021; and (3) Inmate 1 refers to the speaker as "Eric" (WOODIE's first name) when describing this conversation to a woman in the call immediately after call #164. JUDGE's voice is identified on call #199 by the following evidence: (1) I recognize the voice as JUDGE's based on my prior interactions with him, (2) in the call, WOODIE tells Inmate 1 to "hold on" for "Julien"; and (3) in the very next call (call #200), Inmate 1 told a woman

provided to me pursuant to a subpoena. During these calls, WOODIE and JUDGE discuss the trip to Florida to obtain firearms and their intention to sell one of the firearms to Inmate 1 when he is released from custody.

48.     On February 26, 2021, WOODIE spoke with Inmate 1 in call number 164. As described above, on February 25, 2021 – one day prior to this phone call – WOODIE had rented a car from Enterprise, which JUDGE, COLON-BROWN, and INDIVIDUAL C drove to Florida to obtain stolen firearms. The following is a partial excerpt of the call between WOODIE and Inmate 1:[10]

| WOODIE: | I just sent these niggas to Florida to go, you know what I'm saying? |
| Inmate 1: | Yeah yeah yeah. |
| WOODIE: | Umm, she called me right the day after they went, they coming back today. |
| Inmate 1: | Who? |
| WOODIE: | Julien, Dom and umm and [redacted][11]. |
| Inmate 1: | Oh shit, oh alright. |
| WOODIE: | Yeah (unintelligible) you know what I'm saying, you already know. |
| Inmate 1: | Yeah, I hope there's something for me in there. |
| WOODIE: | (unintelligible), it's an arsenal you heard. |
| Inmate 1: | Huh? |

that he spoke with "E" who "passed the phone to fucking, um Julian drunk ass." Julien is JUDGE's first name.

[10] The transcripts of these calls are preliminary only.

[11] Julien is JUDGE's first name. Dom is short for Dominic, which is COLON-BROWN's first name. The redacted name is the same shortened version of INDIVIDUAL C's name as listed in footnote 6 above.

WOODIE:        Arsenal you heard.

Inmate 1:      Yeah.

WOODIE:        Like 5, like 5.

Inmate 1:      Damn.

WOODIE:        Yeah.

Inmate 1:      Shit, I want I want one, I, I, I give ya, nigga, I'm trying.

WOODIE:        They're expensive nigga.

Inmate 1:      Alright (unintelligible) nigga, I'm about, I'm doing my taxes everything right now and this chick getting 1,200.

WOODIE:        Oh word.

Inmate 1:      (unintelligible) hell yea nigga, that's why she said she wait. They um, her tax lady told her, her tax lady told her by the first week in March.

WOODIE:        (unintelligible), listen tell her to hold 1,200 for you. (unintelligible) nice you heard.

Inmate 1:      (unintelligible) yeah, I'm about to tell her cause she already said, she already said oh yeah we're gonna um when you come home we're gonna go shopping and stuff (unintelligible) I was like (unintelligible). So I'm about.

WOODIE:        I'ma try to hold one for you.

Inmate 1:      (unintelligible) hell yeah. Cause and she doing my taxes, I'm about to I'm about to uh claim one of her kids (laughing).

49.      Later in the same conversation, WOODIE and Inmate 1 continued as follows:

Inmate 1:      Damn niggas went, niggas took a little trip, that's crazy.

WOODIE:        (unintelligible) I got a rental for them and everything.

Inmate 1:      Damn, damn I wish I could have went nigga.

WOODIE:        hot (unintelligible) down there and (unintelligible).

Inmate 1:      How long they been down there, like three days?

WOODIE:        Like two.

50.     On March 3, 2021, WOODIE spoke with Inmate 1 again in call number 199. In this call, after speaking with Inmate 1, WOODIE passed the phone to JUDGE, who also spoke with Inmate 1. The following is a partial excerpt of the call between WOODIE, JUDGE, and Inmate 1:

WOODIE:        Alright, hold on, Julien want (unintelligible).

JUDGE:          Yo.

Inmate 1:       Yo what's good?

JUDGE:          What's poppin?

Inmate 1:       Shit, you know.

JUDGE:          Yo listen, you already know what type of time it is, you heard?

Inmate 1:       Nigga, no nigga forgot about me nigga.

JUDGE:          Na I ain't forget about you cause when you come home (unintelligible) real shit.

Inmate 1:       Nigga no but I had nigga, I had nigga, nigga I wanted to get one too nigga. Alright nigga.

JUDGE:          Oh bro, trust me when you get here bro I got you one. You already know, I, everybody's gripped up. Um oh. Oh yeah bro, I went down to Florida bro. Niggas tried to rob me bro and I uh, you know how that shit went like.

Inmate 1:       Ah man.

JUDGE:          Yeah but that nigga (unintelligible). I was supposed to get, I was, I was supposed to, I went down there to get like 5 to 6 but we only came back with like 2, feel me. But shit went left and uh niggas be like, the nigga, the nigga was funny I feel like he set us up. Anyway so I was like fuck it, you know (unintelligible) you know.

Inmate 1:       Yeah.

JUDGE:        But yeah when you come home bro I got, definitely bro you already know you definitely on the list to get gripped up, get the things, you heard, my fault (unintelligible), take the phone from me.

51.    On March 4, 2021, WOODIE spoke with Inmate 1 again in call number 202. The following is a partial excerpt of this call between WOODIE and Inmate 1:

WOODIE:       Oh she was trying to get you uh, one of those things we got.

Inmate 1:     Oh. (unintelligible). I kind of figured that cause she was, she was like you said that it was something I always wanted.

WOODIE:       Yeah.

Inmate 1:     (unintelligible) I felt left out.

WOODIE:       (unintelligible) try to get you something nice.

Inmate 1:     But she about to try and get it on her own or you about to help her?

WOODIE:       Both. Whichever one comes first.

Inmate 1:     (unintelligible)

WOODIE:       Yeah so we didn't obviously get everything cause you know these fucking yeah. They only came back with two.

Inmate 1:     I don't understand how you (unintelligible) get robbed like nigga.

WOODIE:       Cause no they gave him the money and the dude pulled off with it. And then they had to take the money from the middle man (unintelligible). So they got robbed and robbed the other dude.

Inmate 1:     And they basically strong armed the next nigga. The other nigga.

WOODIE:       Yeah, the middle man.

Inmate 1:     Yo. Nigga.

WOODIE:       Retarded.

Inmate 1:     What the fuck.

WOODIE:       You can't make this up. You hear, can't make this up.

Inmate 1:      Why would they give him the money first, like that shit.

WOODIE:       Exactly. That's what I said.

52.      Later in the same conversation, WOODIE and Inmate 1 continued as follows:

Inmate 1:      You're like the brains.

WOODIE:       Why?

Inmate 1:      Nigga cause I'm trying, I'm trying to figure out like nigga, who gonna be the fucking smart one?

. . .

Inmate 1:      I'm saying like when you have to do the rest of your shit, finish the rest of your shit.[12]

WOODIE:       Oh right, I don't know, exactly yeah.

Inmate 1:      (unintelligible) Can't be Dom.

WOODIE:       Definitely not Dom.

Inmate 1:      And [redacted][13] and Jule[14] they on the bullshit. Them niggas.

WOODIE:       Exactly.

<u>RECORDED CONVERSATIONS WITH COLON-BROWN</u>

53.      On April 28, 2021, at the direction of law enforcement, INDIVIDUAL B met with

COLON-BROWN in Farmington, CT. Due to logistical time constraints, law enforcement was

unable to conduct surveillance of this meeting. However, INDIVIDUAL B called me prior

COLON-BROWN arriving, and I was able to overhear the conversation, which I recorded.

---

[12] This appears to be a discussion about who is going to take over when WOODIE serves his time on his pending state court cases.

[13] The redacted name is the same shortened version of INDIVIDUAL C's name.

[14] This is a reference to JUDGE's first name "Julien."

During the conversation, INDIVIDUAL B and COLON-BROWN discussed the firearm

COLON-BROWN sold to INDIVIDUAL B on January 18, 2021. The following is an excerpt

from that conversation:

| | |
|---|---|
| INDIVIDUAL B: | I gotta get rid of that gun bro. |
| COLON-BROWN: | What the one we had? You shot it yet? |
| INDIVIDUAL B: | Dude, of course not, what the fuck am I gonna shoot it for, it's a 22. |
| COLON-BROWN: | (unintelligible) shoot it. |
| INDIVIDUAL B: | Because it's garbage. It's a 22, I told you, I needed the 9. |
| COLON-BROWN: | We can uh, I can get you one. |
| INDIVIDUAL B: | That's what I need. |
| COLON-BROWN: | If you drive to Boston, if you want to take a trip to Boston whenever you wanna head to Boston, I can get you one. |
| INDIVIDUAL B: | And I gotta buy it. |
| COLON-BROWN: | Yeah you gotta buy it, we could go together. |
| INDIVIDUAL B: | How much, how much you talking? 500? |
| COLON-BROWN: | Yeah fucking 500. |

54.     At this point in the conversation, INDIVIDUAL B and COLON-BROWN discuss

traveling to Florida and Boston to buy firearms. The following is an excerpt of that conversation:

| | |
|---|---|
| COLON-BROWN: | With a Florida ID they can just walk up to the door and buy it. |
| INDIVIDUAL B: | Oh. |
| COLON-BROWN: | It's cheaper to do it. |
| INDIVIDUAL B: | That right there, you know it's clean. You can buy it yourself, but if we go to Boston (unintelligible) make sure it's legit because that's the last thing I need. |

COLON-BROWN:    Yeah, my cousin just bought two. He bought a Ruger and he bought, uh a Glock 38, the little one, the little shit (unintelligible). Nah nah I think he paid 1500. He got the light with it too.

55.    Later in the conversation, INDIVIDUAL B and COLON-BROWN return to talking about exchanging the .22 caliber firearm COLON-BROWN sold to INDIVIDUAL B in January 2021 for a 9mm firearm. The following is an excerpt of that part of the conversation:

INDIVIDUAL B:    I need a 9 that's the whole thing.

COLON-BROWN:    My boy is down from New York (unintelligible).

INDIVIDUAL B:    The 22, yeah, switch it.

COLON-BROWN:    Damn, how much you wanted, 900?

INDIVIDUAL B:    Dude, the 900 I gave you.

COLON-BROWN:    Yeah, that's what I'm saying.

INDIVIDUAL B:    Well, how much?

COLON-BROWN:    I mean, I can try. I can try. I'll see. Let me hit his (unintelligible).

56.    On May 4, 2021, at the direction of law enforcement, INDIVIDUAL B met with COLON-BROWN in Farmington, CT. At approximately 5:51 PM, I observed COLON-BROWN meet with INDIVIDUAL B in a vehicle. Prior to COLON-BROWN entering the vehicle, INDIVIDUAL B called me, and I was able to overhear COLON-BROWN's conversation with INDIVIDUAL B, which I recorded. The following in an excerpt of that conversation:

INDIVIDUAL B:    He's on my ass. So he wants the 9 instead of that fucking 22.

COLON-BROWN:    Yeah I know whatcha mean I know whatcha mean.

INDIVIDUAL B:    So I might as well be straight up with you. I was gonna make $300, feel me?

COLON-BROWN:    So how much he?

INDIVIDUAL B:    12.

COLON-BROWN:      Oh so he gave you 12?

INDIVIDUAL B:     Yeah.

COLON-BROWN:      Oh I see whatcha did. [Laughing] Damn. Damn.

INDIVIDUAL B:     So I fucked up.

COLON-BROWN:      Yeah see you should have told me. I was the middle man too yo, so I had to make a couple of dollars you feel me?

INDIVIDUAL B:     (Unintelligible)

COLON-BROWN:      I can get em, I can get em all day just (unintelligible). You gotta go to Boston.

INDIVIDUAL B:     Yeah see that's the thing. He's not gonna give me the money up front. I can't talk with him cause I don't know shit about guns bro. So I look like an idiot. I give him that and then I'm talking out my ass.

COLON-BROWN:      (unintelligible)

INDIVIDUAL B:     It has to be clean though. It has to be clean.

COLON-BROWN:      Yeah I just don't have the money to actually get it cause niggas out here they really not just giving their shits away.

INDIVIDUAL B:     Well due, even if you can get one that's dirty. I got a funny feeling it's going to the club (unintelligible).

COLON-BROWN:      I mean, I can bring him. I could bring 1 or 2 (unintelligible). But if he's gonna want a bunch (unintelligible), I want a cut.

INDIVIDUAL B:     I already know you want a cut. I'm just saying, you know (unintelligible), when you make the deal, think of me too.

COLON-BROWN:      (unintelligible) you know niggas is taxing

INDIVIDUAL B:     (unintelligible) he's talking to me. I know there's a shortage, at least out here.

COLON-BROWN:      That's what I'm saying, people be taxing. (Unintelligible) niggas see a Glock and they want the Glock and then they'll pay for whatever for the gun they wanted cause it's hard, ya know what I mean? Me and my brother, my cousin [redacted] just bought two. I

> believe it's Boston. I know that that nigga's cool with like somebody my age, like he could take a little ride with me. You got a little nephew or something like that? He could take a ride with me. I could go to Boston and I could get them and it's nothing.

INDIVIDUAL B:   He'll do whatever I tell him cause we go back.

57.   Later in the conversation, INDIVIDUAL B and COLON-BROWN talked about COLON-BROWN possessing an AR-15 semi-automatic rifle. The following is an excerpt of that part of the conversation:

COLON-BROWN:   (Unintelligible) I got a little AR but that shit's staying in the cut. You can't take that shit.

INDIVIDUAL B:   You don't wanna sell that one? Whatcha shoot cannons what the fuck?

COLON-BROWN:   Yeah, the AR that shit is staying in the cut, ya mean, over here. That shit's in the like cut cut cut. (Unintelligible) I be up right now, feel me? I be doing what I used to do, but if I can find them shit, I'll letcha know tonight.

58.   Later in the conversation, INDIVIDUAL B and COLON-BROWN talked about how COLON-BROWN went to Florida to buy firearms. The following is an excerpt of that part of the conversation:

COLON-BROWN:   Yo, when I went out there, I went out to um the thing, I went out there to, went out there to buy like fucking 7 guns.

INDIVIDUAL B:   That was the time you went to Florida?

COLON-BROWN:   Yeah, we we and we ended up coming back with three but because the nigga (unintelligible).

INDIVIDUAL B:   (unintelligible)

COLON-BROWN:   Yeah that and one of my boys, I went to go grab one of boy one, those other three we were gonna buy the nigga took off with the money, ya feel me? So like I didn't know what to do. Niggas got us feel me like, just got robbed for a couple (unintelligible) feel me like. So honestly, you really, well I sold it for 9, ya know what I mean? Those shits really only go for like 5, ya know what I mean,

like 5, feel me, maybe even 6 brand new in the box, ya know what
I mean? I had to get a couple dollars feel me?

<u>VIDEO OF JUDGE WITH A FIREARM AND</u>
<u>CASH TRAVELING FROM MASSACHUSETTS TO CONNECTICUT</u>

59.    On May 20, 2021, I observed a video on the Snapchat account of "Julien Judge"

depicting JUDGE traveling in a vehicle. Another person is driving the vehicle and JUDGE is in

the passenger seat. In the video, JUDGE displays what appears to be a firearm for the camera

and then picks up what appears to be a large amount of cash and fans it out for the camera. At the

bottom of the video is the word "Springfield" next to a location icon. Below are screen shots

from the video:

  

60.    Immediately after this video on the "Julien Judge" Snapchat account is an image

of the Holyoke Mall in Holyoke, Massachusetts:



61.     According to Snapchat posts later that evening, JUDGE was in Middletown,

Connecticut.

62.     Later that same evening, COLON-BROWN posted a video on Snapchat[15] of

himself with what appears to be a firearm on his chest:



---

[15] The Snapchat username for this post is "ItsDomi," which is short for COLON-BROWN's first name,
"Dominic."

<u>FEDERAL FIREARMS LICENSING</u>

63.     According to ATF, neither WOODIE, JUDGE, nor COLON-BROWN has a

federal firearms license, which would allow them to engage in the business of dealing in

firearms.

## **CONCLUSION**

64.     Based on the information in this affidavit, I submit that there is probable cause to

believe, and I do believe, that from approximately January 2021 to approximately May 2021,

ERIC WOODIE, DOMINIC COLON-BROWN, and JULIEN JUDGE conspired with each

other, and with others known and unknown, to (a) willfully engage in the business of dealing in

firearms while not being a licensed dealer of firearms within the meaning of Chapter 44, Title 18,

United States Code, contrary to Title 18, United States Code, Sections 922(a)(1)(A); and (b)

knowingly transport and ship in interstate commerce stolen firearms, including a Glock 9mm

handgun with a serial number of WHA242, knowing and have reasonable cause to know the

firearm was stolen, contrary to Title 18, United States Code, Section 922(i); all in violation of

Title 18, United States Code, Section 371.

Respectfully submitted,

KIELY.CHRISTOPH
ER.J.N66C52T27
Digitally signed by
KIELY.CHRISTOPHER.J.N66C52T27
Date: 2021.05.26 14:21:26 -04'00'

CHRISTOPHER KIELY
FBI Task Force Officer

The truth of the foregoing affidavit has been attested to me by FBI Task Force Officer

Christopher Kiely over the telephone on May ___26___, 2021.

/s/ TOF                              Date: 2021.05.26
                                     14:34:49 -04'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE